**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| R.D., a minor by her next friend and legal guardian, DEBORAH DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 3:19-CV-823-PPS |
| | ) |
| CONCORD COMMUNITY SCHOOLS, CORRINE HOWARD, ELISHIA COOK, | ) |
| | ) |
| Defendants. | ) |

# OPINION AND ORDER

R.D. was a freshman girl two days short of her fifteenth birthday when she was suddenly strip searched at Concord High School by Assistant Principle Corrine Howard and school nurse, Elishia Cook. The search was prompted by a tip from two students who reported seeing R.D. place a bag of marijuana in her bra during class. The search of R.D. was done nearly instantaneously after the tip was received. No investigation was conducted by school officials and no effort was made to corroborate the tipsters' account. Because I cannot say the search in this case was, as a matter of law, reasonable at its inception and in its scope, summary judgment is denied as to the school officials on the section 1983 claim and denied as to the School on the state law tort claims. However, summary judgment is appropriate on the *Monell* claim against Concord Community Schools, and R.D. concedes summary judgment is warranted on the state law claims against the school officials.

## Undisputed Material Facts

The following are the undisputed material facts as set forth by the parties. R.D. was in ninth grade at the time of this incident, attending Concord High School. R.D. testified during her deposition that she had been bullied at school—for example, her name was written in the bathroom stalls and she got bullied by some girls because she didn't wear brand name clothes, or because of the way she wore her hair. [DE 33 at 1-2.] She did report to the school when her name was written on the walls and according to R.D., the school did nothing more than paint over it. [*Id.* at 2.]

On October 3, 2017, two students, G.T. and S.B., approached School Resource Officer (SRO) Nicholas Minder in the hallway during the passing period. [Minder Dec., DE 28-5, ¶ 4.] Minder's declaration seems to indicate that the students approached him jointly, and talked to him in tandem. The students told Minder they had seen R.D. place a "baggie of weed" in her bra during class that morning. *Id.* According to the school incident report, this conversation happened around 11:18 a.m. [DE 33 at 9.] SRO Minder knew G.T. and S.B., and considered them to be "reliable" and "trustworthy" based on their past record of reliability in reporting conduct by their peers. [DE 28-5, ¶ 5.]

Without skipping a beat, SRO Minder immediately reported this information to the Assistant Principal Travis Swanson at approximately 11:21 a.m. [*Id.* ¶ 6; DE 33 at 9.] Mr. Swanson and SRO Minder decided to turn the matter over to Assistant Principal Corrine Howard since, like R.D., she is female. [*Id.*]

Just a few minutes later, at approximately 11:25 a.m., Assistant Principal Howard and SRO Minder went to R.D.'s fourth period classroom and asked R.D. to come with them to Ms. Howard's office. [Howard Dec., DE 28-1, ¶ 11; DE 33 at 9.] Defendants allege that Ms. Howard, in the presence of Minder, first searched R.D.'s backpack. [DE 28-1, ¶ 12; DE 28-5, ¶¶ 9-10.] However, R.D. stated during her deposition that the search of her backpack occurred *after* the body search (not before). [DE 28-6 at 10.] Regardless of the timing, nothing illicit was found in R.D.'s backpack.

According to R.D., Ms. Howard and Ms. Cook were present for the strip search. They told R.D. that they were going to conduct a search because someone told them that R.D. had marijuana. [DE 28-6 at 7.] R.D.'s account of the search is important, so I'm going to recite it verbatim here:

> And so they made me take my shoes off, and then my socks, and my shirt, and my pants. And she did, like, my shoes one by one. Like, she just passed the stuff to Elishia Cook. And then the curtain was, like, this wide open. And they gave me, like, a little blanket to kind of, like, wrap myself up in, but it was like an afghan, so it had, like, little holes all over it. And it was, like, freezing in there. And so the blanket wasn't really helping, it was just to hide my skin from anybody who could possibly walk in. And then they would, like, shake out my clothes. And they'd do little whispers. And they're like: All right. You can put your clothes back on. And I think they stopped me, like, before I put my  - - no, no, wait. Hold up. She told me, because she was like: We're going to need you to turn around. I was like: Okay. So I turn in a circle. She was like: Can you shake out your hair, so I flip my hair. She's like: Can you shake out your bra. So I grab the sides of my bra and I shook it out. And I don't really, like, understand what she was wanted me to do. And so then she took her finger and grabbed the center of my bra and shook me a little bit. And I was like: Yo, what are you doing? . . . And then they were like: All right. You can put your clothes back on and have a seat.

[DE 28-6 at 7-8.]

Ms. Howard and Ms. Cook have a similar account of the strip search, but they have included more details about where and how it occurred. According to Ms. Howard, at approximately 11:35 a.m., she walked with R.D. to the clinic, where they met with nurse Cook. [DE 28-1 at 2.] Ms. Howard asked Ms. Cook to remain as a witness to the search, and she agreed. [*Id.* at 3.] Ms. Howard asked R.D. to enter a private area in the back of the clinic that has a cot and a curtain, and Ms. Cook locked the doors of the clinic to ensure privacy. *Id.* There was no gown in the clinic, so they handed R.D. a "big blue blanket" to cover herself during the search. *Id.* Ms. Howard explained to R.D. that she would remove her pants and shirt, but she should keep her undergarments on, and stay behind the curtain the whole time. *Id.* According to both Ms. Howard and Ms. Cook, R.D. remained calm and compliant the entire time. [*Id.*; DE 28-4 at 3.] After Ms. Cook and Ms. Howard checked her pants and shirt, R.D. asked if she should take off her bra. [DE 28-1 at 3.] Ms. Howard told her "no, I don't want you to remove your bra. Just pull the bra band away from your body and shake it so I can see if anything falls out." *Id.* R.D. indicated she didn't understand and peeked out of the curtain, so Ms. Howard demonstrated on her own body what she wanted R.D. to do. *Id.* Then, Ms. Howard "used [her] index finger to lightly touch the spot on R.D.'s bra strap that [she] wanted her to pull away from her body." *Id.* R.D. complied, and nothing fell out of her bra. [*Id.* at 4.] Both Ms. Howard and Ms. Cook say that Ms. Howard never touched R.D.'s body at all during the search, and Ms. Howard says she

4

did not see R.D.'s breasts at any point during the search. [*Id.* at 4; 28-4 at 3.] Nothing was recovered from the search.

All parties agree that the search in the clinic lasted approximately 3 minutes. [DE 28-6 at 24; DE 28-1 at 4.] They also agree that everyone involved remained calm during the search. [DE 28-6 at 18; DE 28-1 at 4.] However, R.D. claims she suffered embarrassment as a result of the search. [DE 28-6 at 19.] Word spread about the search like wildfire around the school, and for weeks students were asking R.D. about it. [*Id.* at 20-22.]

At the time of the search, Concord had in place a drug prevention policy as well as a search and seizure policy. [DE 28-2, DE 28-3.] The search and seizure policy provides as follows:

> Prior to a search of a student's person and personal items in the student's immediate possession, consent of the student shall be sought by an administrator. If the student does not consent, such a search shall be permitted based only upon the administrator's individualized reasonable suspicion to believe that the search will produce evidence of a violation of a law, school rule, or a condition that endangers the safety or health of the student or others. Searches of the person of a student shall be conducted and witnessed by a person of the same gender as the student and shall be conducted in a private place. The student shall be given the option of selecting the witness from the faculty members on the school premises at the time of the search.[1] A searched student's

---

[1] R.D. was not afforded the option of choosing a witness from the faculty members. Nurse Cook was chosen by Ms. Howard to remain as a witness. According to Defendants, this is because R.D. consented to the search. [DE 28-1 at 2; DE 34 at 8 n.3.] The issue of consent was not briefed in detail by the parties, and it seems far from clear that R.D. actually consented to the search, instead of merely acquiescing because she thought she had no choice.

> parent or guardian shall be notified of the search within twenty-
> four (24) hours if possible.

[DE 28-3.]

The complaint alleges several causes of action against defendants Concord Community Schools, Corrine Howard, and Elishia Cook: Count I for violation of 42 U.S.C. § 1983; Count II for intentional infliction of emotional distress; Count III for negligent infliction of emotional distress; Count IV for invasion of privacy; and Count V for battery. [DE 1.]

Defendants now seek summary judgment on all claims. They argue: (1) the search of R.D.'s clothing in the school's health clinic was justified because it was based on reasonable, individualized suspicion; (2) the school should not be held liable because there is no evidence of an official policy, custom, or practice that caused any constitutional violation; (3) Defendants Howard and Cook are entitled to qualified immunity; and (4) R.D.'s state law claims fail because of the Indiana Tort Claims Act ("ITCA") immunity provisions.

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## I.     Whether the Search Was Justified at Inception and Reasonable in Scope

The parties agree that the applicable test here, when looking at the search of R.D., is whether it was justified at its inception and reasonably related in scope. *See Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993) (explaining the inception of the "two-prong test for evaluating whether a search of a student is constitutional."). First, "a search of a student by a teacher or other school official is 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985). Second, the search has to be permissible in scope, meaning "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342. The Seventh Circuit has recognized that "a highly intrusive search in response to a minor infraction would . . . not comport with the sliding scale advocated by the Supreme Court in *T.L.O.*," and that "[w]hat may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search." *Cornfield*, 991 F.2d at 1321.

Let's step back for a minute and look at the overarching guidance the Supreme Court has given to lower courts for situations like these. The Supreme Court found in *T.L.O.* that the school setting "requires some modification of the level of suspicion of illicit activity needed to justify a search," and held that for searches by school officials "a careful balancing of governmental and private interests suggest that the public interest

is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." *T.L.O.*, 469 U.S. at 340, 341. The Court has therefore applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student, and has held the school search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

Several years later, the Supreme Court explained that "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Morse v. Frederick*, 551 U.S. 393, 407 (2007) (citations omitted). And "deterring drug use by school children is an important—indeed, perhaps compelling interest." *Id.* at 407 (quotation marks and citation omitted). In other words, schools are given some leeway when it comes to searching students, as they also have the obvious duty and interest in keeping the children in their care safe.

However, while recognizing schools have an important interest in maintaining the health and safety of children, this interest has to be carefully counterbalanced by the legitimate expectations of privacy that a student still retains in his or her body, even while in school. The Supreme Court has commensurably recognized students' subjective expectation of privacy, especially against a search beyond that of just outside the clothes or a backpack. *Safford v. Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374-

75 (2009).  In *Safford*, the court acknowledged:

> The very fact of [Plaintiff's] pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings. . . . [there is] a different meaning of a search exposing the body from the experience of nakedness or near undress . . . exposing for a search is responding to an accusation reserved for suspected wrongdoers and fairly understood as so degrading that a number of communities have decided that strip searches in schools are never reasonable and have banned them no matter what the facts may be.

*Safford*, 557 U.S. at 374-75.  Along these lines of considering the viewpoint of the student, the Seventh Circuit has noted:

> The impact of a search will also vary with the age of the child. Perhaps counterintuitively, a very young child would suffer a lesser degree of trauma from a nude search than an older child.  As children go through puberty, they become more conscious of their bodies and self-conscious about them.  Consequently, the potential for a search to cause embarrassment and humiliation increases as children grow older.

*Cornfield*, 991 F.2d at 1321 n.1.

Taking the facts in the light most favorable to R.D., as I must at this stage, I cannot say as a matter of law that the search was justified at its inception or that it was permissible in scope.  In fact, there was very little justification for Ms. Howard and Ms. Cook to conduct such an invasive search in this case.  According to SFO Minder, two students approached him in the hallway and told him they had seen R.D. put a baggie of marijuana into her bra during class that morning.  That is it.  This is the only piece of

information provided by Defendants that supposedly justifies this search. We have no evidence that the school attempted to corroborate that these students were actually in the same classroom as R.D. earlier that morning, or that anyone checked with R.D.'s teacher for his or her account, or that they looked at R.D.'s file to see if she had gotten into trouble before with drugs or had any other disciplinary issues, or that they separated the two students (who seemingly approached Minder at the same time and spoke together) and tried to see if their independent versions matched, or that they talked to any other students in that class, or that they considered the fact that R.D. had previously reported to the school that some girls were bullying her. And the school did not call R.D.'s guardian until well after the search had occurred. That is an awful lot that the school officials *did not do.*

Instead, school officials went from tip to strip search lickety-split. According to Concord's own incident report, the tip was received at approximately 11:18 a.m. SFO Minder approached Mr. Swanson, the assistant principal, at 11:21 with this information, and by 11:25 (or seven minutes after the tip was received), Ms. Howard was yanking R.D. out of her fourth hour class and bringing her to the nurse's office for a strip search. This timing is, frankly, alarming.

Defendants claim the fact that SFO Minder considered the students "to be reliable and trustworthy based on their past record of reliability in reporting conduct by their peers" adds to the justification of the search at its inception. [DE 28-5 at 2.] But this is a conclusion; it is not a reason. By simply labeling the student tipsters "reliable"

without telling me *why* they are trustworthy, is really telling me nothing at all.

Questions abound. Did the tippers have a beef with R.D.? How did SFO Minder know

them, did he have any previous interactions or experiences with them, and specifically,

had they tipped him off before where their accusations turned out to be accurate and

verified? In a similar strip search case involving a tip from a supposedly "reliable

student," the Second Circuit noted "[a]s a general rule we are wary of vague or

conclusory statements about an informant's reliability." *Phaneuf v. Fraikin*, 448 F.3d 591

(2d Cir. 2006). [DE 34 at 3.] I'm skeptical as well. Let's be pragmatic. High schools are

a fraught environment with bullying, factions, clicks, cool kids, not so cool kids, choir

kids, athletes, theater kids, etc. If a student tipper knew that all it takes to set off a strip

search of a fellow student whom they are at odds with is their word alone, mischief can

abound. In other words, looking askance at an uncorroborated tipper in the high school

environment seems particularly appropriate.

Defendants claim they *did* conduct further investigation—they searched R.D.'s

backpack. [DE 34 at 3.] This argument is troublesome for two reasons. First, R.D.

claims the school officials searched her backpack *after* they searched her body, not

before, and the facts must be taken in the light most favorable to her. [DE 28-6 at 10.]

Second, contending because the search of the backpack revealed no baggie of weed, that

this corroborates the informants' report that the drugs were on R.D.'s person, is reverse

logic. How could no evidence found in R.D.'s backpack possibly give credence to an

allegation that R.D. had a baggie of marijuana stuffed in her bra? I would think the

opposite would lead to that conclusion—if the officials did find drugs in R.D.'s backpack, that might render the tip that she had drugs on her body more reliable. Anyway, these protestations of Defendants do not change the result: Defendants conducted no investigation about the reliability of the tip, they didn't look at R.D.'s school file, and they didn't even attempt to corroborate the students' account. Like in *Safford*, I believe a jury could find the search was not reasonable at inception because "the content of the suspicion failed to match the degree of intrusion." *Safford*, 557 U.S. at 375.

This segues into my next conclusion which is that I cannot say on summary judgment that the search itself was reasonable in scope. The two students' conjoined tip here is that R.D. had a plastic baggie of marijuana in her bra. We don't know anything more about the quantity of the drugs, the potency, whether R.D. was supposedly distributing drugs to other students, or really anything else. And while I certainly don't condone students bringing any amount of marijuana to school, to me, it isn't the same immediate harm that could be caused by a report of a student with, say, a handgun. As the court in *Safford* stated, we need reasonable suspicion "before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts." *Safford*, 557 U.S. at 377. Here, there was not specific enough information (and the school didn't take the time to determine whether it could credit *or* discredit the tip at issue), and a jury could determine that the tip didn't reasonably justify the extreme nature of requiring R.D. to disrobe down to her underwear, and for

Ms. Howard to allegedly touch and grab her bra.

## II.     Whether Ms. Cook and Ms. Howard are Entitled to Qualified Immunity

Defendants back up argument is predictably that even if the search was unreasonable, they are nonetheless entitled to qualified immunity. [DE 34 at 4.]  And, as usual, qualified immunity is a much closer call than whether Defendants are entitled to summary judgment on the reasonableness of the search.

"A school official searching a student is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Safford*, 557 U.S. at 377 (quotation marks and citation omitted).  The plaintiff bears the burden of establishing the existence of a clearly established constitutional right.  *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993).  They can do so by either pointing to a closely analogous case or showing that the conduct was so egregious that no reasonable officer would have thought he was acting lawfully.  *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008).

Obviously there is no identical case on point to this one, where two students together tipped off a school authority that they saw a student put a baggie of marijuana in her bra, and then within approximately 10 minutes, that student was searched down to her underwear, including having the official touch her bra and shake it.  But there doesn't need to be.  "[A] case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th

Cir. 2012) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, the Supreme Court case *Safford*, decided back in 2009, is on all fours. *Safford* created the parameters of the law establishing that a student search as intrusive as a strip search needs to be supported by individualized and particular suspicion. *Safford*, 557 U.S. at 376. *Safford* has similar facts in that a named student told the school that she got prescription strength pain relief pills from the plaintiff, and the assistant principal searched the plaintiff in the school's nurse's office by having her remove her outer clothing, pull out her bra and shake it, and pull out the elastic on her underwear. *Id.* at 368-69. *Safford* established that when it comes to strip searches, the "categorically extreme intrusiveness" of a strip search "requires some justification in suspected facts." *Id.* at 376. In other words, given the "degree of intrusion" that a strip search entails, "general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off." *Id.* at 375-76. *Safford* requires justification in suspected facts when it comes to strip searches based upon a student tip, which was absent in that case (and this one). *Safford*, 557 U.S. at 376. Because that particularized suspicion was missing in *Safford*, the Supreme Court found that the student strip search violated the Fourth Amendment.

It is true that the majority in *Safford* also determined that qualified immunity was still warranted. However, it did so almost reluctantly, noting at the time that there were different prior opinions of circuit courts, some reading the earlier reasonable requirements of *T.L.O.* as "a series of abstractions, on the one hand, and a declaration of

14

seeming deference to the judgments of school officials, on the other." *Id.* at 378 (quoting *Jenkins v. Talladega City Bd. of Ed.*, 115 F.3d 821, 828 (11th Cir. 1997)). Given the murkiness of the law when *Safford* was decided, the Supreme Court conceded that it might not have been "sufficiently clear in the prior statement of law." *Id.* at 379. But the Court was crystal clear in its *Safford* opinion—clear enough to put people like Ms. Howard and Ms. Cook on notice, that where "the content of the suspicion failed to match the degree of intrusion" in a strip search case based only on an uncorroborated student tip, that if a jury found the strip search not justified, they would be violating clearly established student rights. *Id.* at 375.

Defendants argue that the case law is extremely "fact sensitive" depending on the age of the student, the specific steps taken by the school, and other factors, so rights of students who are searched at school are not "clearly established." [DE 34 at 7.] That's a stretch. Under this logic, school officials would be given qualified immunity in nearly every strip search case. No case is identical. There are always distinguishing facts. But the general parameters of the level of suspicion that is needed to undertake a strip search *is* settled law: you can't subject a student to an invasive strip search based only upon an uncorroborated student tip. In other words, the right's "contours were sufficiently definite" so that a reasonable official in Ms. Cook and Ms. Howard's shoes would have understood that they were violating it. *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014).

R.D. claims there is not a single case that involved a student informant tip that

did not require some kind of meaningful further investigation on the part of the school officials in order to establish the high degree of suspicion required to permit a strip search of a fellow student. [DE 31 at 15.] Defendants don't directly respond to this argument in their reply (and this court will not do their research for them). However, there are certainly cases that shore up Plaintiff's argument and help show it is clearly established law that an uncorroborated student tip is not enough for an invasive search. *See, e.g., Fewless ex rel. Fewless v. Bd. of Educ. of Wayland Union Schs.*, 208 F.Supp.2d 806, 822-23 (W.D. Mich. 2002) (finding qualified immunity did not bar the personal liability of defendants in a case where the student was searched for marijuana after four students reported that plaintiff had marijuana at school); *Phaneuf*, 448 F.3d at 598 (reversing district court, concluding school strip search was not justified at its inception, rationalizing "While the uncorroborated tip [from a student that the plaintiff had marijuana] no doubt justified additional inquiry and investigation by school officials, we are not convinced that it justified a step as intrusive as a strip search."); *see also Doe v. Champaign Comm. Unit 4 Sch. Dist.*, No. 11-3355, 2015 WL 3464076, at *8 (C.D. Ill. May 29, 2015) (denying summary judgment in school search case, determining a jury could find search was impermissible and "[u]nder *Safford*, the scope of Principal Howard's search may have violated [plaintiff's] clearly established constitutional rights," therefore, the principal was not entitled to qualified immunity).

In attempting to distinguish this case from past precedent, Defendants highlight the facts that the student tipsters were not anonymous in this case, and they allegedly

personally saw R.D. put the drugs in her bra. [DE 34 at 3.]  Nevertheless, the school

officials still conducted the search of R.D. based *only* on two students' joint tip.  Here, if

a jury were to find that the search was not justified under a reasonableness standard,

Ms. Cook and Ms. Howard would not be entitled to qualified immunity because clearly

established law shows that such an invasive search requires more investigation and/or

corroboration.

Indeed, Ms. Howard and Ms. Cook should have been well aware of this

standard, because the written Concord school policy also required that "[i]f the student

does not consent, such a search shall be permitted based only upon the administrator's

individualized reasonable suspicion to believe that the search will produce evidence of

a violation of a law, school rule, or a condition that endangers the safety or health of the

student or others." [DE 28-3.]

Defendant Cook also claims she cannot be held liable for the search because "she

was not an active participant." [DE 27 at 19.]  She cites *Wolf-Lillie v. Sonquist*, 699 F.2d

864, 869 (7th Cir. 1983) (emphasis in original), which does state that "[a]n *individual*

cannot be held liable in a § 1983 action unless [she] caused or participated in an alleged

constitutional deprivation."  But here, R.D. has submitted evidence that Ms. Cook

participated in the search: by her own admission, Ms. Cook suggested they use the back

of the clinic for the search, locked the front and back doors, agreed to be a witness for

the search, handed R.D. a blanket, suggested Ms. Howard put on medical gloves before

touching R.D.'s clothing, witnessed Ms. Howard search R.D.'s clothing, and attested

that Ms. Howard did not touch R.D.'s body during the search. [DE 28-4.] In other words, Ms. Cook was very involved with the search and I do think a jury could find that she participated in an alleged constitutional deprivation.

Here, there is a question of fact over whether the search was justified at inception and reasonable in scope. If a jury were to find that it was not, Ms. Howard and Ms. Cook are not entitled to qualified immunity.

### III. Whether Ms. Cook and Ms. Howard are Entitled to Immunity Pursuant to the Teacher Liability Statute

In sort of an alternative argument to qualified immunity, Defendants also contend that Ms. Howard and Ms. Cook are entitled to immunity from liability pursuant to the Teacher Liability Statute, 20 U.S.C. § 7946. That statute provides as follows:

> Except as provided in subsection (b), no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if - - (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity; (2) the actions of the teacher were carried out in conformity with Federal, State and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school; . . . . (4) the harm was not caused by . . . flagrant indifference to the rights or safety of the individual harmed by the teacher . . . .

20 U.S.C. § 7946. The Seventh Circuit hasn't analyzed this statute, but by its own words, it only applies where the actions of the teacher were carried out *in conformity with federal laws*, and the statute further qualifies that liability is not limited where the action "involves misconduct for which the defendant has been found to have violated a

Federal or State civil rights law."  20 U.S.C. § 7946 (d)(1)(C).  If a jury finds that the search here was unconstitutional, then clearly, Ms. Howard and Ms. Cook would not be protected by this statute either.

## IV.    Whether Summary Judgment is Warranted on the *Monell* Claim Against the School

Municipalities like the Concord Community Schools may be held liable under § 1983 if their official policies, including unwritten customs, cause constitutional violations.  *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91 (1978); *see also Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) ("Municipalities and other local government units cannot be liable under § 1983 on a respondeat superior theory, but can be liable if action pursuant to an official policy or custom of the municipality or government causes a constitutional tort.").  There are three ways in which a municipality can violate an individual's civil rights: (1) when "an express policy" exists that, "when enforced, causes a constitutional depravation"; (2) when "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law"; or (3) when "an allegation that the constitutional injury was caused by a person with 'final policy making authority.'"  *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (citation omitted).

In its opening memorandum, Defendants argue that there is no express policy of Concord School that caused a constitutional deprivation in this case. [DE 27 at 12-13.] In her response, R.D. cites to *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), arguing

that *Monell* liability is proper here because "the failure to train amounts to deliberate indifference to the rights of persons." [DE 31 at 16.] This is the only argument R.D. makes in support of municipal liability for the Concord Community Schools—that the failure to train its employees resulted in a deliberate indifference to the rights of students.[2]

In her statement of facts, R.D. does not allege any other instances, other than the search conducted on her, where other students were subjected to unconstitutional searches. This is the type of evidence a plaintiff needs to produce to establish a failure to train. "A single isolated incident of wrongdoing by a non-policymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct." *Cornfield*, 991 F.2d at 1326. Additionally, "an allegation of a failure to train is available only" where the school district's "failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of students." *Id.* at 1327 (quotation omitted). Here, aside from the drug and search policy, R.D. hasn't provided the court with any evidence at all about how Concord Community Schools conducts training, or how that training is supposedly deficient. Thus, summary judgment is warranted on the claims

―――――――――――――

[2] R.D. did not argue that there was an official policy or practice of unconstitutional conduct by the school, or that Assistant Principle Corrine Howard was a policymaker, with final policy making authority. Instead, R.D. only advances one theory in support of *Monell* liability: which is a failure to properly train. Therefore, she has waived these other arguments. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers Int'l Union of N. America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived).

against Concord Community Schools.

**V.     R.D. Concedes That The State Law Claims Against Ms. Cook and Ms. Howard Are Improper**

Defendants argue R.D. cannot recover damages on the state law claims (intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, and battery) against Ms. Howard and Ms. Cook individually because the search was committed within the scope of their employment. *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003).  In response, R.D. concedes that Ind. Code § 34-13-3-5(b) bars a personal judgment against Ms. Cook and Ms. Howard.  Therefore, summary judgment is proper in favor of Ms. Cook and Ms. Howard on Counts II-V.

**VI.    Whether the State Law Claims Against Concord Community Schools Survive Summary Judgment**

Defendants concede that "[t]he proper defendant in a state tort claim for conduct by a governmental employee acting in the course and scope of employment is her employer." [DE 27 at 22.]  Thus, Concord Community Schools is the proper defendant in Counts II through V.  The School's sole argument that it is entitled to summary judgment on the state law claims is that the search conducted was reasonable, and consistent with both federal and state law.  However, Indiana law mirrors federal law. The Supreme Court of Indiana stated that, "[t]o determine whether a school search is reasonable, we consider: (1) whether the action was justified at its inception, and (2) whether the search conducted was reasonably related in scope to the circumstances that justified the interference in the first place." *Myers v. State*, 839 N.E.2d 1154, 1160 (Ind.

21

2005) (citing *T.L.O.*, 469 U.S. at 341-42).  Because I have already determined I can't say as

a matter of law that the search here was justified at its inception and permissible in

scope, summary judgment is likewise inappropriate as to the School on the state law

tort claims for intentional infliction of emotional distress, negligent infliction of

emotional distress, invasion of privacy, and battery.

## Conclusion

For the aforementioned reasons, Defendants' motion for summary judgment [DE

26] is GRANTED IN PART AND DENIED IN PART.

The Motion is GRANTED as to Count I against Defendant Concord Community

Schools.  The Motion is also GRANTED as to Counts II-V against Defendants Corrine

Howard and Elishia Cook.  The Clerk is ORDERED to enter judgment in favor of

Defendants, Concord Community Schools, Corrine Howard, and Elishia Cook on these

claims.

The Motion is DENIED as to Plaintiff's section 1983 claims against Defendants

Corrine Howard and Elishia Cook (as enumerated in Count I), and the state law tort

claims against Defendant Concord Community Schools (as enumerated in Counts II-V)

and these claims REMAIN PENDING.

ENTERED: July 15, 2021.

          s/   Philip P. Simon               
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT